Dale R. SWAGGER, et al., Appellants,

v.

CITY OF CRYSTAL, Respondent.

No. C8–85–735.

Court of Appeals of Minnesota.

Dec. 24, 1985.

Review Denied Feb. 19, 1986.

Shawn M. Bartsh, John F. Bonner, Jr., Minneapolis, for appellants.

Peter J. Timmons, Minneapolis, for respondent.

Wilbur W. Fluegel, Maple Grove, for amicus curiae.

Heard, considered and decided by RANDALL, P.J., and PARKER and SEDGWICK, JJ.

## OPINION

SEDGWICK, Judge.

Appellants Darlene and Dale Swagger sued respondent City of Crystal for injuries Darlene sustained while she and Dale attended a softball game sponsored by the city. The jury returned a verdict in favor of appellants.

The trial court granted respondent's motion for JNOV. We affirm.

## FACTS

Appellants attended a softball game on July 25, 1981, at Welcome Park Field No. 3, which is owned and operated by respondent City of Crystal.

The softball game was part of the 1981 "Crystal Frolics," sponsored by Crystal's Parks and Recreation Department. Darlene Swagger had never played softball; however, she had watched little league baseball and softball games her husband had played.

There was one set of bleachers behind the backstop and another set between home plate and first base. The seating capacity of the bleachers was 50–70 persons. The crowd numbered between 600 and 1,000 people. The Swaggers found the bleachers full. They found a spot to watch the game about six feet past first base towards the outfield and about 30 feet from the first base line.

During the game, Darlene Swagger was injured when struck in the face by a wildly thrown softball. As a result of this injury, she suffered severe and permanent injuries to her nose and right eye.

The trial court gave the jury a secondary assumption of the risk instruction and a contributory negligence instruction.

After several requests for clarification, the jury returned a verdict finding Darlene 49% at fault and the City of Crystal 51% at fault.

The trial court granted respondent's motion for a JNOV, (1) stating that it had erred by denying respondent's motion for a directed verdict on the ground of primary assumption of the risk; (2) stating that it had erred by submitting both a secondary assumption of the risk question and a contributory negligence question; and (3) stating that it had erred by refusing to give respondent's requested jury instruction that "the mere fact that an injury has happened does not of itself mean anyone has been negligent."

## ISSUE

Did the trial court err by granting respondent's motion for a judgment notwithstanding the verdict?

## ANALYSIS

The term "assumption of risk" subsumes a number of discrete and overlapping concepts. *See* Annot. 16 A.L.R. 4th 700 (1982).

Some states, including Minnesota, make a distinction between "primary" and "secondary" assumption of risk.

> The term "assumption of risk" has two meanings in Minnesota. In its primary sense it means simply that the defendant owed no duty of care toward the plaintiff and therefore could not be guilty of negligence with respect to him. In its "secondary" sense assumption of risk means simply that the plaintiff was guilty of contributory negligence or fault * * *.

*Pitts v. Electro-Static Finishing, Inc.*, 607 F.2d 799, 801, n. 2 (8th Cir.1979).

Appellants argue the court erred in granting respondent's motion for JNOV because the doctrine of primary assumption of the risk is no longer valid since the enactment of the comparative fault act, Minn.Stat. § 604.01 (1984). Appellants argue that even if the doctrine still exists, it is not applicable here because the city owed the spectators of the game certain duties.

Appellants are mistaken as to the viability of the doctrine of primary assumption of the risk. The Minnesota Supreme Court has clearly stated that this doctrine is still valid:

> Assumption of risk has been conceptually distinguished according to its pri-

mary or secondary character. Primary assumption of risk, express or implied, relates to the initial issue of whether a defendant was negligent at all—that is, whether the defendant had any duty to protect the plaintiff from a risk of harm. It is not, therefore, an affirmative defense. The limited duties owed licensees upon another's property, * * * or *patrons of inherently dangerous sporting events*, e.g., *Aldes v. St. Paul Ball Club*, 251 Minn. 440, 88 N.W.2d 94 (1958), are illustrative. The classes of cases involving an implied primary assumption of risk are not many and, because this is not such a case, we have no occasion to determine the method by which such issue should be presented to a jury.

*Springrose v. Willmore*, 292 Minn. 23, 24, 192 N.W.2d 826, 827 (1971) (emphasis added).

The supreme court again discussed the issue in 1979:

> In *Springrose v. Willmore, supra,* this court held that primary assumption of the risk remains as an absolute bar to the plaintiff's recovery, whereas secondary assumption of the risk becomes a question of comparative negligence. Primary assumption of the risk is not really an affirmative defense; rather, it indicates that the defendant did not even owe the plaintiff any duty of care.

*Armstrong v. Mailand*, 284 N.W.2d 343, 348 (Minn.1979).

▪ Appellants argue that primary assumption of the risk should not bar their claim. However, the supreme court's holding in *Springrose* indicates that primary assumption of the risk is an active doctrine, despite the enactment of the comparative fault act. Although use of the doctrine is rare, "patrons of inherently dangerous sporting events" are included within its ambit.

▪ Appellants also argue that the owner of the ballpark had a duty to protect spectators. This argument, however, is not supported by Minnesota law. The trial court here relied primarily upon the supreme court's decision in *Brisson v. Minne-*

*apolis Baseball & Athletic Association*, 185 Minn. 507, 240 N.W. 903 (1932). There, an adult bought a grand stand seat ticket, but the seats were filled when he arrived. He sat in temporary seats located outside the foul line behind third base, where he was injured by a foul ball. He had seen ball games as a small boy and as an adult he had recently seen at least one league game. The court cited *Wells v. Minneapolis Baseball & Athletic Association*, 122 Minn. 327, 142 N.W. 706 (1913), for the proposition that the management cannot be held negligent when it provides a choice between a screened in and an open seat, the screen being sufficient in extent and substance. *Brisson* 185 Minn. at 508, 240 N.W. at 904. The court also held that the management need not provide screened seats for all who want them:

> In our opinion they exercise the required care if they provide screen for the most dangerous part of the grand stand and for those who may be reasonably anticipated to desire protected seats, *and that they need not provide such seats for an unusual crowd * * *.*

*Brisson*, 185 Minn. at 509, 240 N.W. at 904 (emphasis supplied).

The court added:

> In our opinion no adult of reasonable intelligence, even with the limited experience of the plaintiff, could fail to realize that he would be injured if he was struck by a thrown or batted ball such as are used in league games of the character which he was observing, nor could he fail to realize that foul balls were likely to be directed toward where he was sitting. No one of ordinary intelligence could see many innings of the ordinary league game without coming to a full realization that batters cannot and do not control the direction of the ball * * *.

*Id.* at 509–510, 240 N.W. at 904.

Again in 1958, the supreme court reiterated the management's limited duty to ball game patrons:

> Normally, the management's duty to protect its patrons from thrown or batted

balls ceases when it offers the spectators a choice between screened-in or open seats unless some reason exists requiring a fuller explanation of the perils involved. No such reason is apparent here.

*Aldes v. St. Paul Ball Club Inc.*, 251 Minn. 440, 441–42, 88 N.W.2d 94, 96 (1958) (footnotes omitted); *see generally*, Kionka, *Implied Assumption of the Risk: Does it Survive Comparative Fault?*, 1982 S.Ill.U. L.J. 371.

 The trial court relied primarily on *Brisson* in granting JNOV. No case has overruled the *Brisson* line of cases and we do not do so here. According to *Springrose* and *Brisson,* the trial court was correct in granting the JNOV, since there was no duty to appellants to do other than provide some protected seating.

### DECISION

The trial court properly granted JNOV against appellants based on the theory of primary assumption of risk. Affirmed.